## City of Covington et al. v. Crolley.

June 21, 1940.

Joseph P. Goodenough, Judge.

Stanley Chrisman and Jos. W. Wotchengall for appellants.

J. Richard Udry for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

The cause, as tried below, presented a question of construction of ordinance of the City of Covington (second class), and the city civil service law, contained in Sections 3235h-1 to and including 3235h-12, 1938 Supp. The controversy was begun by the filing of a petition to which the city and certain officers were made parties defendant, submitted to the court on the defendant's general demurrer, and substantially on the following agreed facts:

Crolley was employed on June 1, 1934, as a laborer in the water distribution service of the city, and continued in that service until March 1, 1940, when he was dropped from the roster by the City Manager. The civil service act (1938) was then in part set out, and it was agreed that by ordinance No. 3062, effective September 15, 1938, "all city employees not heretofore covered were placed under the terms of the 1938 Act, excepting the city manager and the city solicitor."

Under this ordinance the government of the city was divided into five departments: Public Affairs, Works, Finance, Safety (laborers only), and Public Property, the latter being subdivided into Distribution, Buildings, Pumping and Purification Bureaus. Crolley was classified as laborer in the Bureau of Distribution and Property.

On February 29, 1940, the commissioners amended and reenacted ordinance 3062 by No. 3144, the only change to be noted in this controversy being in Section 10, wherein the departments were reclassified as Public Health, Finance and Works, and Property, the latter being divided into Engineering, Street and Sewer Maintenance, Waste Collection and Disposal, Garage, Distribution, Filtration, and Pumping, and City Building. Crolley was classified as a laborer in Works and Property.

By the terms of the original ordinance in the department of Public Property, Division and Distribution,

there were twenty-one classifications of employees, including that of laborer, but not including that of "servicemen." Under amended ordinance (Feb. 1940) all department heads and foremen were removed from civil service classification, and in the Department of Works and Property, subdivision Distribution, there were but two types of employees listed, "servicemen and laborers."

On March 18, 1940, the city manager changed the classification of those employees remaining in civil service in "Distribution" (Works and Property) as servicemen and laborers, and four employees theretofore classed as laborers, and younger in point of continuous service with the city, were classified as servicemen, without competitive examination, and not as provisional appointments.

Following this change in classification, and the reclassification of the four laborers to servicemen, the manager at once abolished the position of laborer in the Distribution Service, and the employees theretofore classed as laborers, four, including Crolley, were let out of service, and those classified as servicemen were held on, leaving no employee in Distribution who had prior thereto been classed as laborer.

The manager announced that whenever it became necessary to use laborers in the Distribution division, laborers from some other division of the Works and Property Department would be called on for such work. From the date of the dropping of Crolley's name from the rolls, no such laborers have been used in Distribution, the regular employees, "servicemen," have done all the necessary work.

Crolley, at the time of his discharge, was older in point of continuous service to the city as a laborer than a number of the employees classified as laborers in other divisions of the Department of Public Works and Property, who were not removed from the service of the city, as such, and who are now in the employ of the city, and Department of Works and Property, as laborers.

It was agreed that prior to the passage of the Civil Service Ordinance of 1938, the City of Covington did not recognize the principle of seniority in service among its employees, nor had the city adopted rules with reference

thereto, and all employees were subject to discharge at the pleasure of the authorities. Further, that laborers in the Water Distribution service received higher pay than laborers in the garbage collection work and other departments of the city. In petition, which is not controverted, Crolley alleges that at the time he was dropped his pay was $115 per month, and he asserted his ability and willingness to continue in service, as a laborer. There was no move to reduce him in pay.

Crolley in his petition set out the facts, in substance, as detailed in the stipulation. He says that he was discharged but the manager told him he was only suspended "due to a reduction in force." His position is that whether discharged or suspended, the act of the manager was in violation of the law and the city ordinance. His theory as stated is that all employees, by terms of the act and the ordinance, were intended to be made secure in their positions. He says that following the enactment of the ordinance, he was subjected to the deductions from his monthly wage for the use and benefit of the pension fund. His prayer was for a mandatory order restoring him to his position at the same pay and wages at the rate of $115 during the period of suspension.

To his petition the appellants, then defendants, filed general demurrer, upon which, and the stipulations, the cause was submitted to the chancellor. The court overruled the demurrer, and granted in part the relief sought, by directing the city authorities to restore Crolley "to his position as an employee of the City of Covington;" the question of salary or compensation was reserved by the court.

In so far as the Act of 1938 is concerned with this discussion, it is observed that it extended power of the city to set up a civil service commission. This was done as stated, and as was allowable the city vested the City Manager with such powers under the act as might have been vested in a Commission.

Section 3, Acts 1938, c. 53, provided for examination "as may be deemed proper, commensurate with vacant positions," and for certification of successful applicants, and for a ranking and grading of applicants. By Section 4 the City Manager was to make all appoint-

ments from the lists, giving preference to those having the highest grades. By Section 5 those who were in the employ of the City at the time of the passage of the Act, and had thus been for one year, were exempt from the "original examination" provisions of the Act, and were eligible for all the benefits provided for in the Act. Section 6 set out qualifications for applicants for positions. Section 1 in so far as applicable, provided in part:

"No employee in the classified service * * *, as designated by the Ordinance * * * adopting this Act after serving a probationary period of six months shall be removed, suspended, reduced in grade or pay, for any reason except inefficiency, misconduct, insubordination or violation of law involving moral turpitude or any rule or regulation adopted by" the city.

Section 9 of the ordinance provided for the classifications in the various departments then in existence or to be created, and further:

"The number of employees shall be sufficient to economically carry on the work of the various departments of the city, and nothing in this ordinance shall be construed to prevent the city manager from employing only a sufficient amount of persons to accomplish said work, commensurate with the financial ability of the city to pay for such services.

"The classification of the various positions or offices shall not preclude the abolishment or change of said classification by the * * * city manager. * * *

"Provided, however, that any reduction in the number of employees from any cause whatsoever shall be made by the suspension of the employees, in the order of the length of their employment by the city; those of greater seniority in the various classifications shall be suspended last, and the suspension of any employee for the sole purpose of reducing the number of employees to meet financial, economical or efficiency demands, shall not prejudice the standing of such employees, and by being otherwise qualified shall be entitled to be restored to his employment, when the number of employees in the department or classification from which he was sus-

pended, shall be increased, such restoration to be made with regard to seniority in the particular department or classification from which such employee was suspended.''

Then follows the classification, in the manner set out in the stipulation. It may be noted, if it be necessary to a consideration of the question, that the amendatory ordinance which had the effect of reclassifying and sub-classifying the departments, was the same as Section 9 of the original of September 15, 1938.

The chancellor, in conformity with Crolley's prayer, directed his restoration to the city's roster as an employee. In working out the controversial question the chancellor has favored us with a comprehensive opinion in which he set out the facts and issue as we have undertaken to detail them, and on those facts concluded that but two questions were presented:

(1) Did Crolley's seniority begin on January 1, 1934, when he was first employed as a laborer by the city, or on February 15, 1938, when the city adopted civil service? (2) Has the city the right, after it has elected to adopt the provisions of the civil service law, and therein has classified the plaintiff as laborer, to later reclassify and set up two classes in one division, that is, servicemen and laborers? and then take four employees previously classified as laborers, and transfer them into servicemen, they being younger in service. Or whether the authorities had the power under a construction of the act and ordinance to abolish the position of laborer in the Works and Property Division, thus discharging or suspending the appellee, classified as a ''laborer,'' and fail to observe the seniority rule by leaving on the roster other ''laborers'' who were younger in point of continuous service than the appellant.

We think the last part of the second question and the first are the ones to be answered, and perhaps an answer to the first will conclude the controversy, though it would be interesting to know, and would be of material help in Crolley's cause, what is the distinction, if any, in the division to which he was assigned, as between ''servicemen'' and laborers. The fact that Crolley was drawing $115 per month would seem to indicate that his

classification might not be termed that of "common laborer."

There is no doubt in our minds the proper authorities, under the law and the adopting ordinance, have the right to classify and reclassify. They also have the right to prefer charges, and accord a hearing on any of the grounds specifically set out in the law, or as amplified in the ordinances, but we have no such case here. The authorities also have the power to abolish an employment, or reduce the force, to accomplish the work commensurate with the financial ability to pay for services; (Section 9 of ordinance) but we are not presented with the question as to the right of the city in good faith to reduce forces in the sake of economy. If this were so, would not the seniority rule apply?

As we note the ordinance, the Department of Works and Property provided for "laborers" in three of the divisions under the departmental title. Only one provided for "servicemen," and it could hardly be conceived, though it may be true, that "Distribution" could be accomplished without laborers. If this be the fact, then there appears no reason for distinction between "laborers" in the various divisions of the one department. Since appellant belonged to that class, it would seem logical that he was entitled to what rights of seniority as were given employees, "laborers" by the act and the ordinance, and this, though not stated in any too artful manner, is his complaint, and upon which he bases his right.

The chancellor in his opinion remarked that the purpose of the civil service law was to eradicate, as far as possible, the "spoils" system; to adopt one of efficiency, so that the public might, as it is entitled to, receive better service, and we, as other courts have done, recognize the right of the law making body of the state to permit cities to adopt the system.

The court correctly said that if the section of the ordinance should receive the construction placed on it by the authorities, then all employees are on equal footing as to seniority rights, and they would have the right to discharge or suspend at will, and the law could only affect those who were employed after the effective date of the act, and he doubted if this was the intention.

This would mean, in part civil service in name, and spoils system in reality, for a time to come.

We are constrained to agree with the chancellor that a fair construction of the provision of Section 9 of the ordinance, when construed in the light of Section 3235h-7 of the Act and other pertinent sections, means that the employees' rights were to be measured by the length of time of service to the city; that is, continuous service. The language of Section 9 of the ordinance, which is not conflicting with the Act, provides that reduction in the number of employees "from any cause whatsoever," must be accomplished by the suspension "of the employees in the order of the length of their employment by the city, those of greater seniority;" that is, length of continuous service to the city, "in the various classifications (laborers) shall be suspended last."

While the word "suspended" is used in the sense of a possible restoration, the first part of the section refers to "reduction in the number of employees," and the section of the act referred to, supra, limits the right of removal to the specific causes set out, "after a six months probationary period."

The court found little to aid him in the construction of the Act and ordinances by reference to Aulich v. Craigmyle, 248 Ky. 676, 59 S. W. (2d) 560, or Norfolk & W. Ry. Co. v. Harris, 260 Ky. 132, 84 S. W. (2d) 69, the only authorities cited by appellant. We agree that neither throws much light on the question, since there is no argument here that Crolley's right was based on any natural right of contract between him and the city, as was the case in the railway seniority cases. Crolley had no natural right to his claim of preference by reasons of his seniority based on long continuous service. The act and the ordinance fixed his rights.

We held in the railroad cases that the employees' right to seniority benefits did not arise out of his employment by the railroad, but by reason of the employees' contract with the brotherhood, and in accord with its constitution and by-laws. The question in these cases appears to have been the rights of seniority, not because of railroad service, but such rights as were

given him under the brotherhood's by-laws, if the railroad in its discretion chose to follow such laws.

On the other hand, appellee has presented some authorities which, though they be not exactly in point, are somewhat persuasive. City of Paducah v. Gibson, 249 Ky. 434, 61 S. W. (2d) 11, was a policeman's case, in a city in which civil service was in effect, in substantially the form as here presented. The law and ordinance provided that in case of reduction of the force, "the youngest members in point of service shall be the first to be reduced."

In concluding that the authorities had erred in discharging appellee and four other policemen who were older members of the department "in point of service," we said: "The language used respecting the rule of seniority must be construed and followed as it is written." Applying the same rule here, it is not difficult to conclude that the ordinance intended that if there be suspension, removal from or reduction in the force, the employees longest in the service of the city should be favored.

We have been unable to find an authority exactly in point, but on the two general propositions it may be interesting to read People ex rel. Jacobs v. Coffin, 282 Ill. 599, 119 N. E. 54; State ex rel. Sonneberg v. Board of Com'rs of Port of New Orleans, 149 La. 1095, 1098, 90 So. 417; Winslow v. Bull, 97 Cal. App. 516, 275 P. 974; Opinion of the Justices, 126 Mass. 603.

We find an interesting opinion in Brand v. Pennsylvania R. Co., D. C., 22 F. Supp. 569, 570, which, while not deciding the question presented, since the case went out on preliminary technical grounds, did announce a sensible reason for the application of the seniority rule:

"Modern methods of our industrial life have brought it about that industrial activities have become centered and concentrated in large combinations so that the individual employee who has accepted employment with one of them and who continues in the employment for any length of time must devote himself to that service. This is as inexorable as if he had been sentenced for life to that relation. This is because after some years of service he becomes unfitted for employment elsewhere

and especially because after he has reached the age of forty he finds he cannot secure such employment. * * * The feeling is so general as to be universal that continuance of employment should be accorded by preference to those who have longest served. This is known as the right of seniority and is recognized as a right.".

After careful consideration we are of the opinion that the proper construction of the language used in the statute and ordinances justifies the conclusion that it was intended thereby to give preference to such employees as had been longest in the service of the city.

Judgment affirmed.